Teresa L. **MERCER**, Plaintiff,

v.

**CITY OF CEDAR RAPIDS
and William J. Byrne,
Defendants.**

**No. C98–143MWB.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Jan. 24, 2001.

Mark John Seidl, Seidl & Chicchelly, Marion, IA, for Plaintiff.

Mohammad H. Sheronick, Cedar Rapids Attorney's· Office, Cedar Rapids, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND, ALTERNATIVELY, MOTION FOR NEW TRIAL

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................1230

II. LEGAL ANALYSIS ........................................................1230
 A. Motion For Judgment As A Matter Of Law ............................1230
 1. Applicable standards ...........................................1230
 2. Sufficiency of the Evidence .....................................1232
 a. Nature of the statements ...................................1232
 b. Findings of actual malice ..................................1234
 c. Protected expressions of idea ..............................1236
 d. Defense of truth ...........................................1237
 e. Damages ...................................................1238
 3. Jury Instructions on Actual Malice ..............................1240
 4. Admission of Evidence ..........................................1240
 5. Defense of Qualified Privilege ..................................1240
 B. Motion For New Trial .............................................1241

III. CONCLUSION ...........................................................1242

In the wake of a well-tried slander case, the court is called upon to resolve the pending post-trial motions filed by defendants. Specifically, the court resolves the defendants' motions for judgment as a matter of law and new trial.

## I. INTRODUCTION AND BACKGROUND

Plaintiff Teresa L. Mercer ("Mercer") filed suit against two defendants, the City of Cedar Rapids ("the City") and William J. Byrne ("Chief Byrne"), the former Cedar Rapids Chief of Police. Mercer claimed that Chief Byrne slandered her by making two statements to THE CEDAR RAPIDS GAZETTE newspaper concerning her discharge as a probationary police officer with the Cedar Rapids Police Department. Specifically, Mercer alleged that Chief Byrne made the following two slanderous statements: (1) that plaintiff did not "meet up" with the standards for a Cedar Rapids Police Officer; and (2) that the off-duty relationship between Captain Peters and Mercer "adversely affect[ed] the workplace." This case was tried for four days before a jury beginning on November 14, 2000, in Cedar Rapids, Iowa. On November 21, 2000, the jury returned a verdict in favor of Mercer, finding Chief Byrne's statement that Mercer did not "meet up" with the standards for a Cedar Rapids police officer was slanderous and awarded her actual damages in the total amount of $48,000.00. The actual damages consisted of $5,000.00 for damages to Mercer's reputation, $23,000.00 for lost wages, and $20,000.00 for past pain and suffering. On November 20, 2000, the Clerk of Court entered judgment.

On November 30, 2000, defendants filed a Renewed Motion for Judgment as a Matter of Law and, Alternatively, Motion for New Trial, pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure. Defendants base their motion for judgment as a matter of law on the following grounds: (1) there was insufficient evidence in the record to permit a reasonable jury to find that either or both statements were slanderous; (2) there was insufficient evidence in the record to permit a reasonable jury to conclude that either statement was made with actual malice; (3) the defendants produced more than sufficient evidence to establish the truth of the statements that were alleged to be slanderous; (4) that the statements were generic and not specifically directed to the plaintiff; (5) there is insufficient evidence supporting the award of damages, and the specific elements of damages submitted to the jury should not have been submitted as a matter of law; (6) the court allowed prejudicial, extraneous, and irrelevant material to be presented to the jury; (7) the court erred by not submitting the instruction on actual malice propounded by the defendants and submitted to the court pursuant to the court's pre-trial order; and (8) the court should have determined as a matter of law that all the elements of the qualified privilege were established. Thus, defendants are seeking an entry of judgment as a matter of law in their favor, thereby setting aside the jury's verdict. Only in the alternative are the defendants requesting a new trial. On December 12, 2000, plaintiff Mercer resisted these motions.

The court heard oral arguments on these post-trial motions on January 10, 2001. Plaintiff Mercer was represented by Mark J. Seidl of Seidl & Chicchelly, Marion, Iowa. Defendants the City and Chief Byrne were represented by Mohammad H. Sheronick of the Office of City Attorney, Cedar Rapids, Iowa. With this background in mind, the court turns to its consideration of the pending motions.

## II. LEGAL ANALYSIS

### A. Motion For Judgment As A Matter Of Law

#### 1. Applicable standards

The standards for a motion for judgment as a matter of law are outlined in Rule 50 of the Federal Rules of Civil Procedure. In pertinent part, Rule 50 provides:

**(a) Judgment as a Matter of Law.**

(1) If during the trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for

judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before the submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

**(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; or

(2) if no verdict was returned;

(A) order a new trial, or

(B) direct entry of judgment as a matter of law.

FED. R. CIV. P. 50(a)-(b).

■ The Eighth Circuit Court of Appeals reiterated the standards to be applied by the district court—as well as the appellate court—in determining a motion for judgment as a matter of law:

When the motion seeks judgment on the ground of insufficiency of the evidence, the question is a legal one. *Hathaway v. Runyon,* 132 F.3d 1214, 1220 (8th Cir.1997); *Jarvis v. Sauer Sundstrand Co.,* 116 F.3d 321, 324 (8th Cir.1997). A jury verdict must be affirmed "'unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party.'" *Stockmen's Livestock Mkt., Inc. [v. Norwest Bank of Sioux City* ], 135 F.3d 1236, 1240–41 (8th Cir.1998) (quoting *Chicago Title Ins. Co. v. Resolution Trust Corp.,* 53 F.3d 899, 904 (8th Cir.1995)).

*Cross v. Cleaver,* 142 F.3d 1059, 1066 (8th Cir.1998); *accord Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (stating that under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.") (citations omitted). Thus, this standard requires the court to:

"[C]onsider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Community Dev. Agency v. Lake Calhoun Assoc.,* 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.,* 886 F.2d 986, 989 (8th Cir.1989)); *see also Stephens v. Johnson,* 83 F.3d 198, 200 (8th Cir.1996) (citing *Whitnack v. Douglas County,* 16 F.3d 954, 956 (8th Cir.1994)), in turn, quoting *Hastings v. Boston Mut. Life Ins. Co.,* 975 F.2d 506, 509 (8th Cir.1992); *Haynes v. Bee–Line Trucking Co.,* 80 F.3d 1235, 1238 (8th Cir.1996); *Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 800 (8th Cir. 1994) (reiterating these factors, citing *White v. Pence,* 961 F.2d 776, 779 (8th

Cir.1992)); *McAnally v. Gildersleeve*, 16 F.3d 1493, 1500 (8th Cir.1994) (same).

█ This standard for consideration of a motion for judgment as a matter of law accords the jury's verdict substantial deference. *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995); *McAnally*, 16 F.3d at 1500. However, even with this deference to the jury's verdict, the jury cannot be accorded "the benefit of unreasonable inferences, or those 'at war with the undisputed facts,'" *McAnally*, 16 F.3d at 1500 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir.1989), in turn, quoting *Marcoux v. Van Wyk*, 572 F.2d 651, 653 (8th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978)), but the court must still defer to the jury's resolution of conflicting testimony. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Having reviewed the applicable standards, the court turns to an examination of the grounds raised by defendants in their motion for judgment as a matter of law to determine whether post-trial relief from the jury's verdict against the defendants is appropriate.

### 2. Sufficiency of the Evidence

### a. Nature of the statements

█ The defendants contend that there is insufficient evidence to support a jury finding that either statement was slanderous. Defendants contend that the statements were not directed specifically at Mercer and that Chief Byrne was not referring to Mercer when he uttered the statements. Defendants emphasize that both Chief Byrne and Gazette reporter Rick Smith were in agreement that the statements were innocuous, generic, and unrelated to Mercer. Thus, defendants argue that for the jury to have found either or both statements to be slanderous, let alone one to be slanderous *per se*, demonstrates that the jury was guided more by prejudice, sympathy, bias and passion. In response, Mercer contends that the conversation between Smith and Chief Byrne could only be considered generic if it had occurred outside the context of Mercer's firing. For example, Mercer highlights the following parts of Smith's testimony: Smith called Chief Byrne about Mercer's firing; Smith was surprised when Chief Byrne spoke to him at all, because public officials almost always decline to comment on personal matters; and Smith could not have run the story that appeared in the Gazette without Chief Byrne's confirmation. Thus, Mercer argues that the conversation between Smith and Chief Byrne was not a disinterested and incidental chat; rather, Mercer argues that Chief Byrne described Mercer to Smith at least inferentially, if not explicitly, as a person who did not "meet up." Moreover, Mercer contends that if Byrne had not meant to damage her reputation, he could have declined to comment, or at least stopped at confirming her firing.

█ As this court concluded in its summary judgment decision, whether or not the statements in this case can reasonably be understood as defamatory *per se* or even defamatory at all presented a jury question. *See Mercer v. City of Cedar Rapids*, 104 F.Supp.2d 1130, 1171–72 & 1181 (N.D.Iowa 2000). This was so because the court found that, in the context of the complete newspaper story, there were reasonable inferences that Chief Byrne's comments specifically related to Mercer. *Id.* However, the court also noted that the statements did not unambiguously target Mercer, or unambiguously identify her as incompetent, because the statements were cast in general terms. *Id.* Thus, because the statements could have two reasonable constructions, the court determined that the procedure outlined in *Kerndt v. Rolling Hills Nat'l Bank*, 558 N.W.2d 410, 418 (Iowa 1997) should be followed, whereby the jury would be required to determine whether (1) one or both of the statements were reasonably understood as defamatory *per se*; (2) one

or both of the statements were understood as defamatory, but not defamatory *per se* (the jury must then determine whether the plaintiff has shown malice, falsity, and damage); or (3) the statements were not understood as defamatory. *Id.* According to the verdict, the jury found that the statement that Mercer did not "meet up" with the standards for a Cedar Rapids Police Officer was slanderous, but not slanderous *per se,* and that the statement that the off-duty relationship between Captain Peters and Mercer "adversely affect[ed] the workplace" was slanderous *per se.*

The jury was presented with the March 14, 1998, article, with the headline "Officer loses job; had relationship with co-worker," that appeared in THE CEDAR RAPIDS GAZETTE concerning Teresa Mercer's discharge. The article stated, in pertinent part, as follows:

Veteran Cedar Rapids police Capt. Phil Peters got a lateral reassignment in January from the command job he loved.

On Friday, the probationary female officer with whom he had an off-duty relationship that attracted the police chief's concern lost her job.

Police Chief Bud Byrne last night downplayed officer Teresa Mercer's dismissal, saying it is not uncommon for a member of the probationary class to lose the job in the year before a permanent assignment begins.

The probationary year, which for Mercer was to have ended in a few days, gives the department and the officer a chance to see if police work is right for the officer, Byrne said.

"And so it's not an unusual thing to find people who just don't meet up," Byrne said.

\* \* \* \* \* \*

Byrne has not publicly detailed what he objected to about the relationship between Peters and Mercer other than to say any off-duty relationship that "adversely affects the workplace has to be addressed."

*See* Exhibit No. 1. The court finds that, in the context of the entire newspaper article, and in light of the evidence presented at trial, there were inferences from which a reasonable jury could conclude that those statements by Chief Byrne were directed at Mercer. Merely because Smith and Chief Byrne were in agreement that the statements in this article were innocuous, generic, and unrelated to Mercer does not make them so. This is especially true when the following portions of Smith's testimony are taken into account, namely, that he called Chief Byrne with the intention of learning about the circumstances surrounding Mercer's firing, and that despite knowing the reason for Smith's call, Chief Byrne, to Smith's surprise, proceeded to converse with him. A reasonable jury could have inferred that when Chief Byrne responded to Smith's call, which was specifically about Mercer, and proceeded to talk about members of the probationary class of the Cedar Rapids police department, of which Mercer was a part, Chief Byrne grouped Mercer, at least inferentially, with those members of the probationary class that "don't meet up." Thus, the court agrees with Mercer's argument that a reasonable jury could have determined that while not perhaps talking directly about Mercer, Chief Byrne's statements describe Mercer inferentially, if not explicitly, as a person who does not "meet up." Additionally, the court points out that a reasonable jury could have determined that Chief Byrne's statements were directed at Mercer because the language "don't meet up" that appears in the newspaper article also appears in Mercer's termination letter signed by Chief Byrne, to wit: "It is my determination that you do not meet the standards required of a police officer in the Cedar Rapids Police Department." *See* Plaintiff's Exhibit No. 5.

■ With respect to Chief Byrne's statement that any off-duty relationship that "adversely affects the workplace," the court finds that a reasonable jury could have concluded that this statement was in reference to Mercer and Captain Peters's

relationship based on the article itself, as well as evidence in the record that reflects the occasions in which Chief Byrne spoke with both Mercer and Peters about their relationship. Therefore, viewing the evidence in the light most favorable to Mercer, as it must in considering the pending motion for judgment as a matter of law, *see Cross*, 142 F.3d at 1066, the court concludes that sufficient evidence was presented at trial to support the jury's finding regarding the nature of the statements. Therefore, defendants' request for judgment as a matter of law on this ground must be denied.

### b. Findings of actual malice

■ Defendants contend that, as matter of law, actual malice was not proven. Specifically, defendants contend that the evidence shows that at the time the statements were made Chief Byrne was speaking what he believed was the truth, in an attempt to protect Mercer, and in such a manner as to say as little as possible to the news reporter. Defendants contend that Smith's testimony that he didn't know why Mercer was fired, that Chief Byrne was not talking about Mercer and that Chief Byrne was not malicious belie any rational finding that Chief Byrne spoke with actual malice to Smith about the situation. Furthermore, defendants contend that Chief Byrne's statements were not facts, but instead were opinions protected by the First Amendment. In response, Mercer contends that actual malice was proven, because there was an abundant showing of reckless disregard, sufficient to amount to circumstantial knowledge of falsehood. Mercer contends that the record is replete with evidence that contradicts any statement that she did not measure up, and that she lacked competence or moral character. Additionally, Mercer points out that there was sufficient evidence upon which to base a finding of conscious ill will entirely apart from reckless disregard. This is so because Mercer asserts that it is quite likely that the catalyst, which may have inflamed Chief Byrne, stemmed from an editorial in the Iowa Tactical Officers Association ("ITOA") newsletter that Chief Byrne admitted made him angry.

In the summary judgment decision, *see Mercer*, 104 F.Supp.2d at 1169–70, the court explained the definition of "actual malice" in this case, whereby the court created a single definition of actual malice that incorporated both "qualified privilege" and "public figure" defamation. Specifically, at the trial, the court instructed the jury with respect to actual malice as follows:

> To show "actual malice," there must be an intent to inflict harm through falsehood. Therefore, a statement is made with "actual malice" if it is made with knowledge that it is false or with reckless disregard for its truth or falsity. A "reckless disregard for truth or falsity" means that the speaker had a high degree of awareness of probable falsity of the statement. Consequently, a "reckless disregard for truth or falsity" may be established where there are obvious reasons to doubt the truth of the statement itself or the information on which the statement was based, but the statement was made anyway.

*See* Final Jury Instruction No. 5 & 6. The court finds that there was evidence in the record such that a reasonable jury could conclude that Chief Byrne's statements were made with the requisite actual malice. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (stating that a plaintiff is entitled to prove actual malice by circumstantial evidence). The court highlights four points in the record to support its finding. First, the court finds that a reasonable jury could have inferred that Chief Byrne was, at a minimum, offended by Mercer's refusal to pay heed to his advice with respect to not frequenting bars. The following colloquy between Chief Byrne and his attorney, Mohammad Sheronick, is illustrative:

> Q: One of the other things that you testified to on your direct examination

was your conversations with officer—captain Peters and officer Mercer, in which you urged them to stay out of bars. Now, in this modern enlightened age, how would you respond to me telling you that you should not impose your whatever your views are on drinking upon other grown adults?

A: This—I realize that I could not necessarily order them to. What I was giving them was a piece of advice from my years of experience, and problems that I had seen develop in years passed, and it was sort of a friendly advice situation. *To show you the difference how things over the years, when I came on the department, if the chief of police had told me what I told Terry, there's no way in God's green Earth that I would have ever gone in a bar.*

Q: Why is that?

A: Because I wanted to be a police office. *And what that chief said was the law. I wasn't going to fight the chief and try to prove that I had—I could—I could tell him what to do or I could show him or put him in his place. I would have done what he said.*

Q: Now, did the fact that neither captain Peters nor officer Mercer apparently did what you said, did that make you mad?

A: Not mad.

Q: What did that make you?

A: *Disappointed* in the fact that, you know, I thought Phil and I had a good relationship over the years, and I didn't know of any bad relationship with Terry. So I thought, you know, by offering them a little fatherly advice, so to speak, they would, especially in light of the fact that Terry told me that she got my message loud and clear, I thought this is done. It's over with, I'm not going to have to worry about this again.

Tr. 93–94 (day 3)[1] (emphasis added). The court finds that a reasonable jury could have inferred from Chief Byrne's testimony that he was more than "disappointed" with Mercer, because she rebuffed his advice that he deemed "was the law." Indeed, Chief Byrne was emphatic that had the chief of police given him the same advice that he gave Mercer while he was a probationary officer "there's no way in God's green Earth that I would have ever gone in a bar." This voluntary comment evinces, or a least a reasonable jury could infer, a sense of outrage on the part of Chief Byrne towards Mercer for her failure to pay heed to his advice, thereby "fight[ing] the chief" and "putt[ing] him in his place." Therefore, the court finds that a reasonable jury could infer actual malice based on Chief Byrne's testimony that is outlined above.

Second, the court finds that a reasonable jury could infer that Chief Byrne acted with actual malice in light of Peters and Mercer speaking to Commissioner Nancy Evans. Ms. Evans was the Public Safety Commissioner in charge of both the fire and police departments, and thus was Chief Byrne's supervisor. Captain Peters testified that he initiated the conversation with Ms. Evans because he felt that he was being improperly investigated, and that he requested that Mercer be present during the conversation. Peters further testified that he wrote a memo to Chief Byrne explaining the meeting that he had with Ms. Evans. The memo also indicated that Mercer attended this meeting. Thus, the court finds that a reasonable jury could have inferred that Chief Byrne was angered by the fact that both Mercer and Peters went "over his head," without his knowledge, to talk to his supervisor about how he was handling matters that occurred in his police department.

Third, the court finds that a reasonable jury could infer that Chief Byrne acted with actual malice in light of the editorial, entitled "ITOA Board Member and Staff Instructor Under Attack," that appeared

---

1. For purposes of this opinion, the court refers to the real-time transcript in the case, which is comprised of four trial dates. Thus, the parenthetical (day 3) refers to the day of the trial.

in the ITOA newsletter dated January of 1998. During the trial, the court gave a limiting instruction with respect to this editorial, instructing the jury that it "is admitted not for the purposes of establishing the truth of any of the matters discussed therein, but only on the question of whether or not it caused offense to police [C]hief William J Byrne." *See* Tr. at 1 (day 2). The court finds that the following colloquy between Chief Byrne and Mercer's attorney is insightful:

Q: And how did you feel when you saw that ITOA newsletter editorial?

A: Unhappy.

Q: Were you a little angry?

A: Yeah, I would have to say I was angry.

Q: And were you angry at Terry Mercer and Phil Peters?

A: No, I was not angry. I was, again, I would say disappointed in them, but not angry with them. I was angry with the article and the way it was written. In police work, you're taught very early on that there's two sides to every story. This gentleman was a lieutenant or is a lieutenant in law enforcement in the Polk County sheriff's, and didn't even have the common courtesy to call me and get my side of the story. It was just there it is, and he blasted, in my opinion the Cedar Rapids Police Department, the City of Cedar Rapids, and I thought that this is something his superior, sheriff Rice, would like to know about, because if the tables were turned, I would want one of my officers writing such a piece for a statewide publication.

Tr. 51–52 (day 3). The court is hard pressed to understand how Chief Byrne would be angry with the ITOA editorial, and yet only disappointed in Mercer and Peters for having spoken with the author of the editorial. A reasonable juror could have inferred that Chief Byrne was equally angry with Peters and Mercer for having presumably provided the fodder that appeared in the editorial that "blasted the Cedar Rapids Police Department," a department that not only he took tremendous

pride in, but according to Chief Byrne, one for which "the citizens of Cedar Rapids have a very high regard." *See* Tr. at 91 (day 3). Additionally, examples of some of the remarks about Chief Byrne that appear in the editorial include: "Politics appear to be alive and well within the Cedar Rapids Police Department due to recent actions by Police Chief William J. Byrne. Information received by the ITOA reveals that the chief has launched a personal attack against Captain Phil Peters...."; "But the police chief, for reasons known only to himself, has taken exception to the pair's off-duty activities."; "Cedar Rapids has many outstanding officers within its ranks and it's a shame that they have to suffer for the actions of a few irresponsible 'leaders.' This is sure to give the department a black eye for some time to come." *See* Plaintiff's Exhibit No. 8. A reasonable jury could have certainly been convinced that the statements contained in this widely disseminated newsletter did cause offense to Chief Byrne at a personal level. Therefore, the court finds that a reasonable jury could have determined that this editorial that appeared in the ITOA newsletter did, indeed, cause offense to Chief Byrne.

Fourth, and related to the colloquy detailed above, the court notes that if it had been the trier of fact, it would have concluded that Chief Byrne's routine use of the word "disappointed/disappointment" to describe his feelings toward Mercer was really a code word for anger. Therefore, the court finds that a reasonable jury could have inferred that Chief Byrne's feelings of disappointment were actually feelings of anger. As the trier of fact, the jury was in the superior position to evaluate the demeanor of Chief Byrne when he testified about his "disappointment" with Mercer, and therefore, the court will not interfere with its reasonable finding that Chief Byrne acted with actual malice.

#### c. *Protected expressions of idea*

■ Furthermore, defendants contend that Chief Byrne's statements were not

factual claims, but instead were opinions protected by the First Amendment. The Eighth Circuit Court of Appeals explained that in the context of the First Amendment, whether a statement is one of fact or opinion is a question of law to be decided by the court. *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305 n. 7 (8th Cir.) (en banc), cert. denied, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *accord Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989) (citing *Janklow*, 788 F.2d at 1302–03) (setting forth the four factors used to distinguish between protected expressions of idea and actionable assertions of fact). In *Lundell Mfg. v. American Broadcasting Companies*, 98 F.3d 351, (8th Cir.1996), the Eighth Circuit Court of Appeals explained:

> For example, in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court rejected the argument that opinions are absolutely protected by the First Amendment, *id.* at 18–19, 110 S.Ct. 2695, recognizing that "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* at 18, 110 S.Ct. 2695. The Court allowed the defamation action to go forward, ruling that a reasonable trier of fact could find that the so-called opinion could be interpreted as a false assertion of fact. *Id.* at 21, 110 S.Ct. 2695. Had the Court believed it must independently decide whether a statement constituted a false statement of fact, the Court would not have used this inquiry. *Accord Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir.1995) (standard for summary judgment is whether a reasonable factfinder could conclude that the statements imply a false assertion of objective fact).

*Id.* at 358–59. The *Lundell* court further stated that "[t]he question of whether there has been any intrusion on First Amendment principles is seemingly subsumed in the inquiry as to whether there is substantial evidence to support the jury's findings as to falsity and substantial truth." *Id.* at 359; *see Norse v. Henry Holt & Co.*, 991 F.2d 563, 567 (9th Cir.

1993) (summary judgment for author appropriate when no reasonable jury could understand the statement, when read in context, to be defamatory); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 195–96 (8th Cir.1994) (summary judgment for union appropriate when its statements could not reasonably be read to be false assertions of fact).

■ Here, because there was a jury question as to whether Chief Byrne's statements were slanderous, slanderous *per se*, or not slanderous as all, there necessarily was a jury question as to whether Chief Byrne's statements were reasonably capable of a defamatory meaning, that is whether they "impl[ied] an assertion of fact," *see id.*, that was false. *See Kerndt*, 558 N.W.2d at 418 (explaining that a plaintiff alleging defamation ordinarily must prove that the statements at issue were made with malice, were false, and caused damage). Based on the evidence in the record, the court finds that a reasonable jury could have concluded that Chief Byrne's statements were false assertions of fact. Consequently, the court will not interfere with the jury's finding that Chief Byrne's statements were defamatory, and thus, not opinions protected by the First Amendment.

#### d. Defense of truth

■ In the alternative to their position that the statements that form the basis of this lawsuit are not slanderous, defendants contend that they proved the truth of both statements. Specifically, defendants contend that the record is replete with evidence showing how Mercer did not "meet up" as an officer. For example, defendants assert that Mercer's own witnesses at best spoke of a mixed perception of her skills as an officer. Moreover, defendants contend that the record shows numerous specific examples of how the off duty conduct of Mercer adversely affected the workplace. In response, Mercer contends that several evaluations, the testimony of

two captains and two field training officers and Mercer's own testimony demonstrated her competence. Mercer argues that the evidence provided by co-officers with direct observation of Mercer's abilities is far more probative that the statements made by Chief Byrne. The court agrees.

First, the court notes that the jury concluded that the defendants were successful in proving the truth of the statement that the off-duty relationship between Captain Peters and Mercer "adversely affected the workplace." Thus, the defendants' defense of truth argument regarding this statement is moot. With respect to the other statement that the plaintiff did not "meet up" with the standards for a Cedar Rapids Police Officer, the court finds that there was sufficient evidence in the record to support the jury's verdict that the defendants did not prove that this statement was true or substantially true by the greater weight of the evidence. This is so because there was testimony from Captain Peters (Tr. at 26–28, day 2), Captain James J. Noonan (Tr. at 79, 82, day 2), police officer Charles Fields (Tr. at 104, day 2), police officer Scott Syverson (Tr. at 113, day 2), and police officer Jeff Faircloth (Tr. at 130, day 2) indicating that Mercer was, in fact, competent. Therefore, viewing the evidence in the light most favorable to Mercer, as it must in considering the pending motion for judgment as a matter of law, *see Cross,* 142 F.3d at 1066, the court concludes that sufficient evidence was presented at trial to support the jury's finding that the defendants did not prove the statement that Mercer did not "meet up" with the standards of a Cedar Rapids Police Officer, was true or substantially true by the greater weight of the evidence. Therefore, defendants' request for judgment as a matter of law on this claim must also be denied.

#### e. *Damages*

 Defendants contend that Mercer failed to offer evidence of damage to her reputation and that she failed to offer any evidence of injury to reputation. Accordingly, defendants contend that because Mercer has not established entitlement to recover damages for injury to her reputation, she is not allowed to recover any other "parasitic" damages such as lost wages and pain and suffering either. For this proposition, defendants cite to *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 223 (1990). Defendants also contend that Mercer offered no evidence of causation that linked the comments attributed to Chief Byrne to her failure to be hired for a law enforcement position. In response, Mercer contends that she established damage to her reputation in light of the evidence adduced at trial that for over two years there was no offer of employment as a police officer in her county. She also points out that her husband's former supervisor stated that the comments such as those made in the Gazette by Chief Byrne would dissuade a law enforcement agency from considering Mercer for employment.

 The defendants are correct in stating that in order to prove damages to reputation Mercer must prove both that such damages should be awarded and the amount of the damages to be awarded. *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 140 (Iowa 1996), *cert. denied,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997). In the case of statements that are not libelous *per se* but libelous *per quod,* Iowa law requires that a "plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings." *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 222 (1998); *Johnson v. Nickerson,* 542 N.W.2d 506, 513 (1996) (stating that "[t]o recover in an action for defamation, a plaintiff must ordinarily prove some sort of cognizable injury, such as injury to reputation"). Moreover, to prove damages, the jury must "be presented with evidence upon which the consequences of the [slander] can be judged, evidence such as the nature of the plaintiff's reputation before the [slander] was published and the extent of the publication." *Wilson,* 558 N.W.2d at 140 (citations omitted). Thus, evidence of Mercer's

prior reputation is only useful in determining the amount of damages awarded, not whether they should be awarded as a matter of law. *See Wilson,* 558 N.W.2d at 140.

There was evidence in the record that Mercer was not hired because of Chief Byrne's statements, which suggested to perspective employers that her reputation was of concern. Mike Richmond, who is a division manager for the Department of Correctional Services of the Sixth Judicial District, testified that the article would have a negative impact on someone's reputation and that a perspective employer would be affected by it. Specifically, Mr. Richmond testified that when he read the article, he interpreted it to mean that Mercer couldn't do her job at the Cedar Rapids Police Department. *See* Tr. 153 (day 2). He also testified that he would not want to hire Mercer as a police officer in his police department knowing that she had failed the probation of another police department. He said, *inter alia,* "if you fail to make probation in a police department, I guess it would be common sense to question whether she'd make it in another department, another police department." *Id.* at 154.

Moreover, there was evidence in the record that Mercer's reputation before Chief Byrne's statements were published in the Gazette was that she was a good police officer. As stated earlier, testimony from Captain Peters (Tr. at 26–28, day 2), Captain James J. Noonan (Tr. at 79, 82, day 2), police officer Charles Fields (Tr. at 104, day 2), police officer Scott Syverson (Tr. at 113, day 2), and police officer Jeff Faircloth (Tr. at 130, day 2) indicated that Mercer had a reputation as a good police officer. However, after Chief Byrne's statements were published in the Gazette, her employment opportunities as a law enforcement officer were all but foreclosed because her reputation was of concern. Captain Peters testified that, after her discharge and publication of the article, when Mercer made efforts to obtain other employment as a police officer in Marion, Iowa City, Johnson County Sheriff's Department, and the Mount Vernon Police

Department she was unsuccessful. *See* Tr. at 28–29 (day 2). Mercer also testified that she sought employment as a police officer to no avail in Marion, the Johnson County Sheriff's Department, the Black Hawk County Sheriff's Department, the Mount Vernon Police Department, and the Lisbon Police Department. *See* Tr. at 127 (day 1). Although she did state that she was offered employment at the Iowa City Police Department, such offer was not until August or September of 2000, which was two years after the article in the Gazette was published, and Mercer testified that she had to decline the offer because as a single mother she was unable to obtain day-care during the shifts that she would have been expected to work. *Id.* at 128.

Viewing the evidence in the light most favorable to the plaintiff, the court finds that there was sufficient evidence presented that Mercer did, indeed, prove damages to reputation. Accordingly, because the court finds that Mercer did establish entitlement to recover for damages to reputation, she is allowed to recover other "parasitic" damages such as lost wages and pain and suffering. *See Schlegel,* 585 N.W.2d at 223. As demonstrated above, Mercer was unable to secure employment as a police officer. Even though, for nearly two years, Mercer attempted to mitigate her damages, she was not able to recoup the lost wages until she found employment as a realtor. Mercer presented evidence as to the amount of money that she lost during that time period. In so doing, the court finds that there was sufficient evidence in the record to support the jury's award of lost wages.

Additionally, with respect to the damages for past pain and suffering, Mercer testified that as a result of the article, she has been ignored, shunned or given the "cold shoulder" by her former colleagues of the Cedar Rapids Police Department. *Id.* at 125–26 (day 1). She further testified that as a result of the article, she suffered from severe mi-

graines, which necessitated visits to the hospital, lost approximately twenty (20) pounds, and cried all the time. *Id.* at 133–34. When asked what effects the publication of the article in the Gazette had on Mercer, Captain Peters testified that for months she was "extremely depressed, crying quite a bit." *See* Tr. at 28 (day 2). Thus, the court finds that there was sufficient evidence in the record for the jury to award damages for Mercer's past pain and suffering. *See Lara v. Thomas*, 512 N.W.2d 777, 786 (1994) (allowing recovery of damages for "emotional distress and resulting bodily harm").

### 3. Jury Instructions on Actual Malice

Defendants contend that the instruction for actual malice, which is outlined above, was inaccurate. Defendants assert that they submitted their proposed instruction that accurately sets forth both forms of "actual malice" that Mercer had to prove, inasmuch as Mercer was a public figure and the court determined that the qualified privilege was available to Chief Byrne. Defendants contend that not submitting the instruction requested by them on actual malice was prejudicial in that the jury was not apprized of the state of law; the jury was not adequately and accurately informed of the definitions of actual malice; and the jury was not apprized of the high standard and quantum of proof necessary to establish actual malice. In response, Mercer states that the jury was properly instructed on actual malice.

This court explained and clarified in great detail in its summary judgment opinion, *see Mercer*, 104 F.Supp.2d at 1169–70, the proof necessary to show actual malice under Iowa law in the circumstances specific to this case.[2] Therefore, the court will not repeat its explanation here. Suffice is to say that the court concludes that the jury was properly instructed on actual malice. *See Cross v. Cleaver*, 142 F.3d 1059, 1067 (8th Cir.1998) (citing *Ryther v.*

*KARE 11*, 108 F.3d 832, 846 (8th Cir.1997) (en banc) (citations omitted)) (stating that the trial court has broad discretion in instructing the jury).

### 4. Admission of Evidence

Defendants contend that they were prejudiced by the admission of irrelevant, extraneous and collateral evidence that confused and misled the jury and resulted in a verdict premised upon passion, prejudice and confusion. For example, the defendants argue that all of the evidence regarding other relationships between police officers was irrelevant, confusing and prejudicial. The court disagrees.

Initially, the court notes that the defendants' claim that this court adopted a liberal standard of admission of evidence may in large part be due to the fact that they objected to the admissibility of every piece of evidence that was identified in the Pretrial Order, even including business records generated by their own clients, as well as the testimony of virtually every witness called by the plaintiff in her case in chief. Notwithstanding, the court finds that the evidence regarding the other relationships between police officers in the Cedar Rapids Police Department was directly relevant as to whether Chief Byrne's statement that, Mercer did not "meet up" with the standards for a Cedar Rapids police officer, was or was not true. *See* FED. R. EIVD. 401 ("Relevant evidence means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Therefore, the court finds that admission of the evidence during trial was not irrelevant, extraneous or collateral.

### 5. Defense of Qualified Privilege

Defendants contend that all the elements of the qualified privilege were met

---

2. Additionally, the court sent letters to counsel explaining the court's rationale for the jury instructions. These letters are included in an appendix to this order.

and that Mercer failed in carrying her burden of proving by clear and convincing evidence that Chief Byrne acted with actual malice. Therefore, defendants argue that since the privilege is lost on proof of actual malice, and since there is no evidence in the record to support the finding by the jury that Chief Byrne acted with actual malice, the court should hold, as a matter of law, that the qualified privilege was established as a matter of law. The court disagrees.

As noted by the defendants, if a plaintiff proves the defamatory statement was made with actual malice the privilege will not apply. *See Mercer*, 104 F.Supp.2d at 1169–70. As the court determined earlier, however, there was sufficient evidence in the record that Chief Byrne did, in fact, act with actual malice. Accordingly, the court finds that defendants' privilege does not apply here because the jury determined that Chief Byrne's statements were made with actual malice.

In sum, the court concludes that there is sufficient evidence in the trial record to support the jury's finding with respect to the nature of the statements, and actual malice. The court also finds that there is sufficient evidence in the trial record to support the jury's finding that the statements were defamatory and, thus, not protected by the First Amendment, and that defendants failed to prove the truth of the statement that plaintiff did not "meet up." The court also finds that there is sufficient evidence in the record to sustain the award for damages to Mercer's reputation, lost wages and past pain and suffering. The court further finds that the jury was properly instructed on actual malice, that the admission of evidence during the trial was not irrelevant, extraneous or collateral and that the defendants did not establish their defense of qualified privilege, as a matter of law, since it was lost on the jury's finding of actual malice. Therefore, defendants' motion for judgment as a matter of law is **denied**.

**B. Motion For New Trial**

Federal Rule of Civil Procedure 59, entitled "New Trials; Amendment of Judgments," states, in relevant part, as follows:

(a) **GROUNDS**. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts in the United States . . . .

FED. R. CIV. P. 59(a). Regarding motions for new trial under Federal Rule of Civil Procedure 59, the court in *White v. Pence*, 961 F.2d 776 (8th Cir.1992) observed:

With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir.1984) (citation omitted). Similar language appears in *Brown*, 755 F.2d at 671–73; *Slatton [v. Martin K. Eby Constr. Co.]*, 506 F.2d [505], 508 n. 4 [ (8th Cir.1974), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975) ]; *Bates [v. Hensley]*, 414 F.2d [1006], 1011 [ (8th Cir. 1969) ], and early authority cited in *Bates. See also Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1266 (8th Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). These cases establish the fundamental process or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for j.n.o.v.

*Id.* at 780. Thus, the court in *Pence* concluded the district court may grant a new trial on the basis that the verdict is against the weight of the evidence, if the first trial

results in a miscarriage of justice. *Id.; see also Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1010 (8th Cir.2000) (stating that a motion for new trial should only be granted if the jury's verdict was against the great weight of the evidence so a to constitute a miscarriage of justice) (citation omitted); *Shaffer v. Wilkes,* 65 F.3d 115, 117 (8th Cir.1995) (citing *Pence* for this standard); *Nelson,* 26 F.3d at 800 (stating "[a] motion for new trial should be granted if, after weighing the evidence, a district court concludes that the jury's verdict amounts to a miscarriage of justice."); *Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1266 (8th Cir.) (observing that the correct standard for new trial is the conclusion that "the [jury's] verdict was against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice."), *cert. denied,* 513 U.S. 989, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994).

In support of their alternative motion for new trial, defendants re-assert the same arguments they asserted in their motion for judgment as a matter of law. The court previously examined these arguments under its analysis of defendants' motion for judgment as a matter of law, and concluded that the arguments did not sufficiently support granting such a motion. Similarly, because the jury's verdict does not weigh against the 'great weight' of the evidence, the court concludes that the jury's verdict does not amount to a miscarriage of justice. Therefore, defendants' motion for a new trial is also **denied**.

### III. CONCLUSION

The court has considered each of the grounds raised in defendants' motion for judgment as a matter of law, and concludes that the motion must be **denied**. Likewise, the court has considered the grounds raised in defendants' alternative motion for new trial, and finds that this motion must also be **denied**.

One final point. This case was zealously and very well-tried by counsel on both sides. Throughout the pre-trial, jury trial, and post-trial phases counsel demonstrated the highest level of professionalism and civility to each other, the parties, the witnesses, and the court. Mr. Seidl and Mr. Sheronick once again prove that the highest standards of professionalism and civility are not inconsistent with zealous and skilled advocacy—in fact, they enhance it.

**IT IS SO ORDERED.**

### APPENDIX

November 8, 2000, letter to counsel regarding jury instructions

November 13, 2000, letter to counsel regarding jury instructions

*Via Facsimile Delivery*

November 8, 2000

Mark J. Seidl

776 13th Street

Marion, IA 52302

Tel.: (319) 377-9770

Fax.: (319) 377-5671

*Attorney for Plaintiff Mercer*

Mohammed H. Sheronick

City Hall- 7th Floor

Cedar Rapids, IA 52401

Tel.: (319) 286-5025

Fax.: (319) 286-5135

*Attorney for Defendants*

**Re:** Court's proposed Jury Instructions in *Mercer v. City of Cedar Rapids and William J. Byrne,* No. C 98–143–MWB (11/8/00 VERSION)

Dear Mr. Seidl and Mr. Sheronick:

I have received your Proposed Jury Instructions for the trial in this matter, which is set to begin with jury selection by Judge Jarvey on Monday and to continue with my reading of the Preliminary Jury Instructions on Tuesday morning. I have prepared my first draft of proposed instructions in light of your suggestions.

However, I wish to draw your particular attention to the following matters:

- In both the **Preliminary Jury Instructions** and the **Final Jury Instructions**, wherever I have a stock instruction comparable to your proposals drawn from the 8th Cir. Models or the Iowa Civil Jury Instructions (ICJIs), I have used my stock instruction, unless the Iowa instruction had some *substantive* impact. Also, I have occasionally placed proposed *Preliminary* Jury Instructions in the *Final* Jury Instructions, and vice versa, as suits my usual practice. I will point out specific instances of each of these changes where I think it is particularly important to do so.

- In **Preliminary Jury Instruction No. 2—Statement of the Case**, I have relied primarily on your Joint Jury Statement. However, I have inserted into your second paragraph the explanation that Chief Byrne's statements "concern[ed] [Mercer's] discharge as a probationary police officer with the Cedar Rapids Police Department," to provide some additional context to the lawsuit. I have also inserted that the defendants deny that the statements at issue are slanderous at all, in light of their position on summary judgment. Finally, I have deleted your third paragraph, as the effect of various determinations by the jury will become clear in the course of the instructions. *See, e.g.,* Preliminary Jury Instruction No. 3—Elements of the Claim and Defense.

- **Preliminary Jury Instruction No. 3— Elements of the Claim and Defense** presented the analytical difficulties that plague the entire process of instructing the jury in this case, and indeed, the analytical difficulties presented by the jury questions I concluded were presented in my ruling on the defendants' motion for summary judgment. Specifically, the jury's determination on the *third element* of Mercer's claim—regarding the nature of the statements as either slanderous *per se,* slanderous, but not slanderous *per se,* or not slanderous at all—determines the remaining elements the plaintiff must prove. *See Mercer v. City of Cedar Rapids,* 104 F.Supp.2d 1130, 1172 & 1181 (N.D.Iowa 2000) (citing *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997)). Hence, I have divided the statement of the elements in this instruction on the basis of the determination made on the third element, making this instruction something of a "flow chart."

Also, as I concluded in the summary judgment ruling, Mercer is a "public figure." *See id.* at 1171. Therefore, she must prove "actual malice" to prevail on her claim, whether or not the statements at issue are slanderous *per se,* and the determination of "actual malice" for this purpose is made according to the same standard that would overcome the defendants' qualified immunity defense. *Compare Bitner v. Ottumwa Community Sch. Dist.,* 549 N.W.2d 295, 300 (Iowa 1996) (defining "actual malice" for purposes of slander against a public official or figure), *with Taggart v. Drake Univ.,* 549 N.W.2d 796, 804 (Iowa 1996) (defining "actual malice" in the same way for purposes of determining whether the qualified privilege had been overcome); *see also Mercer,* 104 F.Supp.2d at 1169 n. 6 (commenting on the lack of distinction under Iowa law between the standards for "actual malice" for purposes of a "public figure" defamation claim and overcoming the qualified privilege defense). Consequently, "actual malice" is an element under either branch of the jury's further determinations. "Falsity" and "damages" are unique to the "slander, but not slander *per se*" branch. *See, e.g., Mercer,* 104 F.Supp.2d at 1170–71. These "branches" are treated in separate instructions in the Final Jury Instructions. This Preliminary Jury Instruction is intended as a "roadmap" or "flow chart" for the jury that provides some sense of direction and applicable standards as they hear the evidence.

This "flow chart" instruction includes considerably more explanatory material than is usual in my "elements" Preliminary Jury Instruction. However, in order for the jury to follow the evidence, I felt it was necessary to define here "slander," "slander *per se,*" and "actual malice." For example, the *plaintiff's slander claim* portion of the instruction begins with a brief explanation of the distinction between "slander" and "libel," with the further explanation that what is at issue here is "slander," focusing on Chief Byrne's oral comments to the media, not the publication in print of those comments. *See, e.g., Mercer,* 104 F.Supp.2d at 1167 (distinguishing between the "twin torts" of libel and slander under Iowa law). The definitions of "slander *per se* " and "slander, but not slander *per se* " are drawn from *Mercer,* 104 F.Supp.2d at 1170–72, and more specifically, from the decisions cited therein.

I have also thought it necessary here to make at least an abbreviated explanation of the defendants' **affirmative defense of "truth,"** for which I have used the first paragraph of ICJA 2100.6, *and compare* Defendants' Requested Jury Instruction in II.B.2. I have added that the defendants bear the burden of proving their defense by the greater weight of the evidence.

- **Preliminary Jury Instruction No. 4— Burden of Proof** distinguishes, *inter alia,* between proof by "the greater weight of the evidence" (I do not use "preponderance," as it is my impression that "preponderance" means less to a jury than "greater weight") and "clear and convincing evidence." The former definition is my stock instruction, which is comparable to ICJI 100.3, and the latter definition is, like the parties' agreed proffer in I.B. of the Proposed Jury Instructions, based on ICJI 100.19.
- **Preliminary Jury Instruction No. 5— Duty of Jurors** includes an explanation of the proper treatment of a municipal defendant and its liability for the conduct of an employee, such as Chief Byrne.
- **Preliminary Jury Instruction No. 8— Credibility of Witnesses** includes instructions on expert witnesses and hypothetical questions that are similar to the defendants' proffers in II.A.2. I understand that there is some conflict between the parties concerning disclosure of experts and hence their use at trial. However, this instruction is cast in terms of what evidence *may* be presented. Moreover, I prefer to instruct the jury on the way to treat expert testimony *before* such testimony is presented; therefore, I routinely include instructions on experts in my Preliminary Jury Instructions, rather than in my Final Jury Instructions. On the other hand, "impeachment" instructions, such as the proffers concerning prior statements of non-party witnesses and parties that were or were not under oath appear in my Final Jury Instructions.
- The remaining Preliminary Jury Instructions are essentially my stock instructions, which I believe cover the issues addressed in the pertinent instructions proffered by the parties.
- Turning to the **FINAL JURY INSTRUCTIONS, Final Jury Instruction No. 2** is the "impeachment" instruction to which I referred above. It includes slightly modified versions of the instructions proffered by the parties on prior statements of non-party witnesses, but clarifying the effect of whether the statements were or were not under oath. It also includes the parties' proffers regarding prior statements of parties.
- **Final Jury Instruction No. 3—Plaintiff's Claim** essentially attempts to explain in words the process indicated in the "flow chart" statement of elements in Preliminary Jury Instruction No. 3. It includes a caveat that the jury need only find that *one* statement was slanderous or slanderous *per se,* but they must unanimously agree on which statement, for the plaintiff to prevail. The next

three instructions play out the steps indicated in the "flow chart" Preliminary Jury Instruction.

- In **Final Jury Instruction No. 4—Plaintiff's Claim: Nature of the Statements,** I have included the first three elements the plaintiff must prove under any circumstances. Unlike the "barebones" statement of the first two elements, I have included here an explanation of element *one* that identifies the two statements at issue from the newspaper article and, for element *two,* an identification of the "other person" to whom Chief Byrne allegedly communicated the statements. The explanation of element *three* is essentially the same as in Preliminary Jury Instruction No. 3. However, the further process, based on the jury's determination on element *three,* is cross-referenced to additional instructions, including an explanation that a verdict in favor of the defendants is required if the jury finds that neither of the statements was slanderous at all.

- **Final Jury Instruction No. 5—Plaintiff's Claim: Slander *Per Se*** states only the necessary "actual malice" element, with an explanation drawn from *Bitner v. Ottumwa Community Sch. Dist.,* 549 N.W.2d 295, 300 (Iowa 1996). This is in preference to the defendant's proffered instruction on "actual malice." The explanation also reiterates the meaning of "clear and convincing evidence," which applies only to this element of the claim; elements must otherwise be proved only by "the greater weight of the evidence." If the plaintiff has proved elements 1–3, as required by Final Jury Instruction No. 4, and proves this element, as required, then the instruction refers the jury to the instruction on the defendants' affirmative defense of "truth."

- **Final Jury Instruction No. 6—Plaintiff's Claim: Slander, But Not Slander *Per Se*** is the instruction on the other "branch" of the analysis. No explanation appeared necessary for "falsity" in element *four* of this instruction. The

explanation for element *five,* "actual malice," is identical to the explanation in Final Jury Instruction No. 5. For the explanation to element *six,* on causation of damage, I have modified ICJI 700.3. Again, I have cross-referenced the instruction on the defendants' affirmative defense of "truth."

- **Final Jury Instruction No. 7—Defendants' Defense:** Truth is the full explanation of the defense in ICJI 2100.6, slightly modified.

- **Final Jury Instruction No. 8—Damages—In General** includes many of the matters raised in the plaintiff's proffers concerning damages. I understand that it is the defendants' contention that no instructions on damages are appropriate. However, I have included such instructions for the jury if they determine that the plaintiff has prevailed on her claim.

- **Final Jury Instruction No. 9—Damages—Specific** is based on ICJI 2100.7. However, I found the explanation of "general damages" in the model particularly uninformative: Just what kind of damages does the law "presume," anyway? I found more guidance on the question in *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 222 (Iowa 1998), from which I have paraphrased. Of particular importance is the reference in *Schlegel* to the ability of the jury to award "substantial damages" without specific proof of injury to reputation. I have expressly indicated that "general damages" may only be awarded for a statement the jury has found is "slanderous *per se.*" The explanation of "damages to reputation" is essentially as in ICJI 2100.7. I have identified the third category of damages, identified in the model only as damages in Chapter 200, as "compensatory damages," and I have then listed the items of damages claimed by the plaintiff, with explanations from Chapter 200 models interpolated, along with the definition of "present value" from ICJI 200.35B.

- **Final Jury Instruction No. 10—Damages—Punitive** is based on ICJI 210.1,

as is the plaintiff's proffer. However, I have interpolated an explanation that punitive damages may be awarded only against defendant Byrne. The City is not subject to punitive damages under provisions of the Iowa Municipal Tort Claims Act, Iowa Code § 670.4(5), and I have seen no indication of evidence of a waiver of that protection. *See also Kelley v. Story County Sheriff*, 611 N.W.2d 475, 483–84 (Iowa 2000); *Fettkether v. City of Readlyn*, 595 N.W.2d 807, 813 (Iowa Ct.App.1999). Therefore, I have not given the plaintiff's proffered instructions on punitive damages against the City.

- I am working on a **VERDICT FORM**, but I am not yet satisfied with it. I will send you a draft as soon as possible this afternoon. I believe that it is important to extract as much information from the jury as possible under any circumstances, and that is certainly the case here, when the analytical process the jury must go through is quite complicated. Therefore, I have rejected the parties' proffers of simple "general verdict" verdict forms.

These instructions are my first drafts, so I offer them now to help you prepare for trial. However, I believe that the Preliminary Jury Instructions are approaching their final form. You will, of course, have the opportunity to make any objections you have to the final form of instructions on the record before the instructions are read to the jury. Nevertheless, it is important that the Preliminary Jury Instructions be in final form as soon as possible and that we have the opportunity to develop the final set of Final Jury Instructions.

Therefore, to assist me with the preparation of revised versions of the instructions, *objections to this draft of proposed Preliminary and Final Jury Instructions,* or *written notice* of the lack of any such objections, as well as any *different or additional instructions* that you can reasonably foresee

before evidence develops at trial, with supporting authority, *must* be received in writing by my office **not later than 1:00 p.m. on Friday, November 10, 2000.** Written objections should also be filed subsequently with the Clerk of Court, as reflected in the attached order.

Thank you for your attention to these matters.

*Via Facsimile Delivery*

November 13, 2000

Mark J. Seidl

776 13th Street

Marion, IA 52302

Tel.: (319) 377-9770

Fax.: (319) 377-5671

*Attorney for Plaintiff Mercer*

Mohammed H. Sheronick

City Hall-7th Floor

Cedar Rapids, IA 52401

Tel.: (319) 286-5025

Fax.: (319) 286-5135

*Attorney for Defendants*

**Re:** Court's *Revised* Preliminary and Final Jury Instructions in *Mercer v. City of Cedar Rapids and William J. Byrne,* No. C 98–143–MWB (11/13/00 VERSION)

Dear Mr. Seidl and Mr. Sheronick:

Attached please find my Revised Preliminary and Final Jury Instructions To The Jury (11/13/00 VERSION) in this case. I received the plaintiff's objections and comments on the 11/8/00 VERSION on Thursday afternoon and the defendants' objections to that set on Friday morning. I appreciate the care with which the parties have obviously reviewed the instructions and I have made some changes in light of your comments and objections. However, I have also rejected a good many of your arguments, for reasons I will explain in some detail below. I wish to draw your

particular attention to the following matters:

- First, I must dispel what I am afraid are one or two misunderstandings of my summary judgment ruling. In their objections to the *plaintiff's* proposed jury instructions, the defendants stated that, in my summary judgment ruling, I "determined that the allegedly slanderous comments were not slanderous per se...." However, I made no such determination; indeed, I took some pains to make clear in the summary judgment ruling, and again in my letter regarding the 11/8/00 VERSION of the instructions, that whether or not the statements at issue are slanderous *per se,* slanderous, but not slanderous *per se,* or not slanderous at all is a *jury question* in this case. *See Mercer v. City of Cedar Rapids,* 104 F.Supp.2d 1130, 1171–72 & 1181 (N.D.Iowa 2000) (citing *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997)). I do not wish to belabor the point, because the defendants have not made any objection to my putting to the jury the question of whether or not the statements at issue are slanderous *per se* in the 11/8/00 VERSION of the instructions, but I do want to make sure it is clear to the parties precisely what questions remain for the jury to decide.

Similarly, the plaintiff appears to contend that whether or not she is a "public figure" remains an open question. However, I also addressed that question in the summary judgment ruling, where I concluded that, as a matter of law, a police officer is a "public figure" for purposes of a defamation claim. *See Mercer,* 104 F.Supp.2d at 1171. In making her assertion that she is *not* a "public figure" in her objections to the 11/8/00 VERSION of the jury instructions, the plaintiff cited Iowa decisions generally stating the standards for determining whether or not a person is a "public figure" for purposes of a defamation claim. She did not, however, attempt to distinguish—or even address—

the various decisions I cited in my summary judgment ruling as specifically holding that police officers are "public figures." *See Mercer,* 104 F.Supp.2d at 1171. I have reviewed the question, on the impetus of the plaintiff's apparently renewed challenge to that holding, and I find that, in addition to the cases cited in the summary judgment ruling regarding whether police officers are "public figures," the list of decisions holding that a police officer, even one at the patrol officer level, is a "public official"—who must also show "actual malice" to prevail on a defamation claim, *see, e.g., Jones v. Palmer Communications, Inc.,* 440 N.W.2d 884, 894–95 (Iowa 1989) (also holding that whether or not a person is a public official or public figure is a questions of federal constitutional law, not state law)—is lengthy indeed. I cite here only significant decisions of federal courts and the most recent decisions of state courts: *Time Inc. v. Pape,* 401 U.S. 279, 283–84, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (the deputy chief of detectives of a metropolitan police force was a "public official" for purposes of his defamation claim); *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (a deputy sheriff was a "public official" for purposes of a defamation claim); *Rattray v. City of National City,* 51 F.3d 793, 800 (9th Cir. 1994) (a police officer is a "public official" for purposes of his or her defamation claim, and must consequently show "actual malice" to prevail, if the statements at issue relate to his or her status as a public official), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 39 (1995); *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1069 (5th Cir.1987) (the plaintiffs, a former chief deputy sheriff and former chief of detectives, "apparently concede, as they must under the case law, that they were public officials in 1977 when they served as law enforcement officers." *See, e.g., St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)

(deputy sheriff); *McKinley v. Baden,* 777 F.2d 1017, 1021 (5th Cir.1985) (police officer). Nor do Zerangue and Carriere claim that the articles referred to any conduct of theirs not connected to their positions as "public officials."); *McKinley v. Baden,* 777 F.2d 1017 (5th Cir.1985) (a city police officer is a "public official" for purposes of defamation law); *Barge v. Ransom,* 30 S.W.3d 889, 891 (Mo.Ct.App.2000) ("Police officers are considered public officials within the meaning of the *New York Times Co.* decision. *Shafer v. Lamar Publishing Co., Inc.,* 621 S.W.2d 709, 710–11 (Mo. App.1981)."); *Rotkiewicz v. Sadowsky,* 431 Mass. 748, 752, 730 N.E.2d 282, 287 (2000) ("We conclude, because of the broad powers vested in police officers and the great potential for abuse of those powers, as well as police officers' high visibility within and impact on a community, that police officers, even patrol-level police officers such as the plaintiff, are "public officials" for purposes of defamation."); *Early v. The Toledo Blade,* 130 Ohio App.3d 302, 321, 720 N.E.2d 107. 120–21 (Ct.App.) ("The Supreme Court of Ohio has noted, 'The United States Supreme Court has repeatedly recognized that police officers are public officials.' *Soke v. Plain Dealer* (1994), 69 Ohio St.3d 395, 397, 632 N.E.2d 1282, 1284."), *appeal denied,* 85 Ohio St.3d 1405, 706 N.E.2d 788 (1999). The decision of the Tenth Circuit Court of Appeals in *Gray v. Udevitz,* 656 F.2d 588 (10th Cir.1981), a case involving a determination that a policeman in a town of 30,000 was a "public official" for purposes of defamation law, is particularly illuminating:

> Street level policemen, as well as high ranking officers, qualify as public officials under the test of *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). They "have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs," *id.* at 85, 86 S.Ct. at 676, and their

position "has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees...." *Id.* at 86, 86 S.Ct. at 676. The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official. Police officials have uniformly been treated as public officials within the meaning of *New York Times. See, e.g., Time, Inc. v. Pape,* 401 U.S. 279, 291–92, 91 S.Ct. 633, 640–41, 28 L.Ed.2d 45 (1971) (deputy chief of detectives and lieutenant); *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) (deputy sheriff); *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (city police chief); *Meiners v. Moriarity,* 563 F.2d 343, 352 (7th Cir.1977) (federal drug enforcement agent); *Ethridge v. North Mississippi Communications, Inc.,* 460 F.Supp. 347, 350 (N.D.Miss.1978) (undercover narcotics agent); *Thuma v. Hearst Corp.,* 340 F.Supp. 867, 869 (D.C.Md.1972) (police captain); *Rosales v. City of Eloy,* 122 Ariz. 134, 593 P.2d 688, 689 (1979) (police sergeant); *Ammerman v. Hubbard Broadcasting, Inc.,* 91 N.M. 250, 572 P.2d 1258, 1261 (Ct.App.1977). *See generally,* Annot., 19 A.L.R.3d 1361, 1375–76 (1968).

*Gray,* 656 F.2d at 591. Plaintiff Mercer is plainly a "public official" or "public figure" for purposes of her defamation claim, even under the standards es-

poused in the Iowa decision of *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884 (1989), upon which she relies. As explained in *Gray*, a police officer has " 'substantial responsibility for or control over the conduct of government affairs,' " *Jones*, 440 N.W.2d at 895 (drawing this definition for "public official" who must show "actual malice" from *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966)), and is also a person who " 'occup[ies][a] positio[n] of such pervasive power and influence that [she is] deemed [a] public figur[e] for all purposes.' " *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Nothing in the Iowa decisions Mercer has cited requires me to retreat from my conclusion in the summary judgment ruling that Mercer is a "public figure," and the decisions cited above make clear that Mercer is also a "public official."

Moreover, although the plaintiff contends that no "qualified privilege" will attach in the circumstances of this case, that is also a jury question in this case. In the summary judgment ruling, I concluded that the defense of qualified privilege is *available* to the defendants, although the jury must determine whether the defense has been proved or overcome, and the defense is overcome by proof of "actual malice." *See Mercer*, 104 F.Supp.2d at 1167–70. Therefore, Mercer *must* prove "actual malice" to prevail on her claim, and must do so by "clear and convincing evidence," and I have not removed any references to this requirement or the applicable standard of proof. I will return to the meaning of "actual malice" below.

- First, however, I turn to the plaintiff's specific objections to the **PRELIMINARY JURY INSTRUCTIONS** (I find that the defendants have made specific objections only to the Final Jury Instructions and the Verdict Form). In **Preliminary Jury Instruction No. 3—Elements of the Claim and the Defense,**

the plaintiff's objections to inclusion of language referring to a "clear and convincing" standard of proof and the inclusion of the "actual malice" element to which it refers are answered above. I do agree, however, with the plaintiff's suggestion that some explanation of the presumptions that arise from a finding that a statement is slanderous *per se* should be included in the explanation to element *three*. Therefore, I have added the italicized language to the first two paragraphs of the explanation to element *three* on page 3–4:

This element requires some further explanation, as your finding on this element determines what further elements the plaintiff must prove. *Under Iowa law, there are two types of statements that give rise to a claim for slander, statements that are "slanderous per se," and statements that are "slanderous, but not slanderous per se." If you find that a statement is "slanderous per se," the plaintiff is not required to prove the falsity of the statement or that she was damaged by it; instead, damages are presumed. However, if the statement is "slanderous, but not slanderous per se," the plaintiff must prove both falsity of the statement and that she was damaged by it.*

The focus of the analysis of whether a statement is *"slanderous per se"* or *"slanderous, but not slanderous per se"* is on the meaning of the statement or how it will be understood by a reasonable person. . . .

*See Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 222 (Iowa 1998). Also, I have modified the definition of "slander *per se* " to refer to "social relations" instead of "social intercourse," which was the language used in *Schlegel*, 585 N.W.2d at 222 (quoting *Prewitt v. Wilson*, 128 Iowa 198, 202, 103 N.W. 365, 367 (1905)). To help distinguish further "slander *per se* " from "slander, but not slander *per se*," I have also added the following to the definition of

"slander" in the second full paragraph of the explanation to element *three* on page 4:

> In other words, a statement is "slanderous, but not slanderous *per se*" if it is only slanderous by reference to the facts or circumstances beyond the words actually used.

*Schlegel,* 585 N.W.2d at 222. Finally, I have moved to the end of this statement of the elements of the plaintiff's claim the instruction, "If you find that the statement was **not understood as slanderous at all,** then the plaintiff cannot prevail on her slander claim," to maintain the hierarchical order of the jury's findings regarding the statements as "slanderous *per se,*" "slanderous, but not slanderous *per se,*" or "not slanderous at all." *See Mercer,* 104 F.Supp.2d at 1172 & 1181 (citing *Kerndt,* 558 N.W.2d at 418).

> I acknowledge the plaintiff's concern that Preliminary Jury Instruction No. 3 could be "somewhat confusing to a juror." However, I believe that these changes will do much to eliminate the confusion without depriving either party of a jury determination on questions of fact.

- Both parties have made objections to the **FINAL JURY INSTRUCTIONS.** In **Final Jury Instruction No. 2—Impeachment of Witnesses,** the plaintiff objects to the last sentence of paragraph 4 of the instruction in the 11/8/00 VERSION. The pertinent portion of the instruction is now on page 21 and continues on to page 22. The plaintiff reads this sentence as suggesting that the jury should consider a witness's testimony if it is corroborated at all. I do not agree that the language identified carries the inference the plaintiff asserts. Rather, the language indicated that the jury should not disregard testimony if other *credible* evidence supports it. However, both in the place indicated and in the last sentence of the instruction on page 22, I have changed the language from "other *credible* evidence" to "other evidence *you believe*" to make clear that the *credibility* of corroborating evidence is what should guide a jury on whether to accept or reject certain testimony, not merely whether the testimony is corroborated at all.

- I appreciate the plaintiff calling attention to the typographical error in the sixth line of the first paragraph of **Final Jury Instruction No. 3—Plaintiff's Claim.** I have added "the" between "to" and "nature." As to the plaintiff's proposed change to the third sentence of the second paragraph on what is now page 23, I agree with the plaintiff that the jury must unanimously agree *on the character of the statement* on which she prevails. However, that is a different matter from the issue addressed in the statement the plaintiff challenges, which instructs the jury that they must unanimously agree *on which statement or statements the plaintiff prevails.* I have added language addressing the plaintiff's requested clarification to the end of the *first* paragraph of this instruction, by adding, "You must unanimously agree on the nature of each statement as either 'slanderous *per se,*' 'slanderous, but not slanderous *per se,*' or 'not slanderous at all.'" I have also attempted to clarify, in the last paragraph, the requirement that the jury must unanimously agree on whether the plaintiff has prevailed on one or both statements, and if only on one statement, which one.

- Both sides have made objections to **Final Jury Instruction No. 4—Plaintiff's Claim: Nature of Statements.** The defendants contend that the explanation to element *one* characterizes the statements as indicating that Chief Byrne was referring specifically to the plaintiff, but they contend that the evidence will show that defendant Byrne was only making "generic" comments about probationary employment and his own duty to address an off-duty situation that adversely affects the workplace. It is the plaintiff's claim, however, that Chief Byrne made these statements *about her,* and it is for the jury to decide whether Chief Byrne made any statements about the plaintiff.

Although I agree with the plaintiff that changing the structure of the final paragraph of this instruction might be helpful, I do not agree that reference should be made to prevailing on "that theory of slander." The point of these "signal" instructions is to indicate that further elements apply to each *statement*, based on what the jury determines the nature of the statement to be, in order for the plaintiff to prevail on her slander claim *as to that statement.* This goes back to that part of the previous instruction about treating each statement *separately* and unanimously agreeing that any statement is slanderous—either slanderous *per se*, or slanderous, but not slanderous *per se*—before the plaintiff can prevail. I do not think renumbering the instructions as 5(a) and 5(b), instead of 5 and 6, is of material assistance.

I have imported into this instruction the revisions to the explanation to element *three* that I made in Preliminary Jury Instruction No. 3.

- I have already answered the plaintiff's objection to inclusion of "actual malice" elements in Final Jury Instructions Nos. 4, 5, and 6, and elsewhere in the instructions and verdict form. As to the defendants' objection to the definition of "actual malice" in **Final Jury Instruction No. 5** and **Final Jury Instruction No. 6,** I believe the defendants have misread my summary judgment ruling and misinterpreted Iowa law.

Taking the latter point first, the defendants contend that I held that, as to a "public figure," actual malice turns on the attitude of the speaker, while in the context of "qualified privilege," actual malice focuses on the speaker's attitude toward the plaintiff, citing *Mercer,* 104 F.Supp.2d at 1169, so that what the defendants call "both components"— "reckless disregard" and "ill will"—must be included in the definition here. However, I came to no such conclusion in my summary judgment ruling that two dif-

ferent standards for, or two components of, "actual malice" must be satisfied in this case. Rather, as I explained in footnote 6 on the cited page of the summary judgment ruling in this case, in a decision I wrote in 1994, *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413 (N.D.Iowa 1994), I had observed "that 'actual malice' in the context of overcoming the qualified privilege differed from the 'actual malice' necessary to prove libel of a public figure [or public official] under *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)." *Mercer,* 104 F.Supp.2d at 1169 n. 6. I explained in *Thomas* that, as the law stood in 1994, the difference was the following:

> ["Actual malice" to overcome qualified privilege] required "ill will" toward the plaintiff, while ["actual malice" for purposes of "public figure" defamation] did not, but instead focused on the defendant's attitude toward the truth of the statements. *Thomas,* 869 F.Supp. at 1443 at n. 7 (citing *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990)). This court further stated that "actual malice" under the *New York Times* standard was shown if a statement was made " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Id.* (quoting *Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 643 (8th Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1293, 94 L.Ed.2d 150 (1987)).

*Mercer,* 104 F.Supp.2d at 1169 n. 6. What the defendants overlook is the following recognition that an intervening decision of the Iowa Supreme Court *had changed the law and blurred the distinction between "actual malice" in the two contexts:*

> However, in *Taggart [v. Drake Univ.,* 549 N.W.2d 796, 803 (1996) ], the Iowa Supreme Court apparently disregard-

ed this distinction, because the court stated that "actual malice" for purposes of overcoming the qualified privilege "occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity," the *New York Times* "actual malice" standard [for "public figure" defamation]. *Taggart*, 549 N.W.2d at 804. *Thus, the court in Taggart equated proof of "knowledge of falsity" or "reckless disregard of falsity" with proof of the "ill will" necessary to establish "actual malice" to overcome the qualified privilege. Id.* at 1169–70 n. 6 (emphasis added). To put it another way, I agree with the defendant that, in *Taggart*, the Iowa Supreme Court stated that "[a] finding of actual malice [for qualified privilege purposes] turns on the motive for the communication, and requires proof that the statement was made with ill will or wrongful motive." *Taggart*, 549 N.W.2d at 804. However, in *Taggart*, this statement is immediately followed by the statement that "[a]ctual malice occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity," *id.*, which is the *New York Times* standard for "actual malice" in the context of "public figure" defamation. Thus, "reckless disregard" does establish the necessary "ill will."

I have used here the definition of "actual malice" from *Bitner v. Ottumwa Community Sch. Dist.*, 549 N.W.2d 295, 300 (Iowa 1996), a "public figure" defamation case, because it fully encompasses the "ill will" requirement for "actual malice" necessary to overcome the qualified privilege *as that requirement is defined in Taggart*. Moreover, the definition from *Bitner* also *retains* the "ill will" requirement, in that it states that "'[t]o show malice, there must be an intent to inflict harm through falsehood,'" *Bitner*, 549 N.W.2d at 300 (quoting *Jones*, 440 N.W.2d at 894), although the *Bitner* decision *again* indicates that

the necessary showing of "actual malice" is fully satisfied by demonstrating "a reckless disregard for truth or falsity" and further explains that "[a] reckless disregard for truth or falsity may be established 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). I have paraphrased this explanation in my instruction. Therefore, I believe that my single definition of "actual malice" in these Instructions, for purposes of both "qualified privilege" and "public figure" defamation, is in accord with decisions of the Iowa Supreme Court handed down since I decided *Thomas* in 1994. *All that I have added to the definition for the present draft of the instructions is the definition of "reckless disregard" as "a high degree of awareness of probable falsity,"* which is drawn from *Jones*, 440 N.W.2d at 894. I have also placed the "intent to inflict harm through falsehood" language *first*.

● The next objection is the plaintiff's objection **Final Jury Instruction No. 7—Defendants' Defense: "Truth."** Although the plaintiff objects to giving this instruction at all, because the plaintiff believes it will be unsupported by the evidence, until and unless the evidence demonstrates conclusively that Chief Byrne's statements were false, the "truth" of the statements is a jury question. The plaintiff also asserts that I should strike the last sentence of the second paragraph, and replace it with a paraphrase of language regarding the degree to which the defendant must prove the truth of a statement from *Jones*, 440 N.W.2d at 891. I will not strike the challenged language, which is drawn directly from ICJI 2100.6, but I will add the plaintiff's paraphrase, as it is not incompatible and may be of assistance to the jury to understand the meaning of "substantial" truth, which was the purpose of the explanation in

*Jones.* I have also changed all references in this instruction to "defendants" rather than "defendant."

- Both sides have several objections to my explanation of available damages. I am not persuaded by all of these objections, but they have required me to make some changes and clarifications in the instructions and the verdict form. First, contrary to plaintiff's formulation, "general damages" simply are *not* available *unless* the plaintiff proves that one or more statements were slanderous *per se,* even if "general damages" encompass what might otherwise be "damages to reputation." *See* ICJI 2100.7, committee comment. However, if a statement is "slanderous *per se,*" I do not see that there is any error in giving the jury the opportunity to award either "general damages" or "actual damages" (consisting of "reputational damages" and "compensatory damages"), *but not both.* I agree with the plaintiff's contention that "general damages" are intended to encompass the "reputational damages" and "compensatory damages" that the plaintiff might otherwise be required to prove, if the statement is only "slanderous, but not slanderous *per se,*" but I do not agree with the plaintiff that "reputational damages" include mental anguish, which is instead a matter of "compensatory" or "parasitic" damages. *See Schlegel,* 585 N.W.2d at 222 ("[T]he jury is allowed to award substantial damages [for slander *per se* ] without the necessity of the plaintiff proving actual damage to reputation. The existence of damage to reputation is conclusively ·presumed from the publication of the libel. In contrast, if a statement is libelous per quod, the plaintiff must prove damage to reputation and consequently any special damages such as mental anguish.") (citations omitted); *see also id.* ("[D]efamation is not concerned with the plaintiff's own humiliation, wrath, or sorrow, except as an element of 'parasitic' damages attached to an independent cause of action. In case of statements that are not libel-

ous per se but libelous per quod, this means a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings.") (citations and quotation marks omitted).

The defendants are also correct to the extent that they argue that, even in the case of slander *per se,* in order to recover "general damages," the plaintiff must still prove *injury to reputation;* she is not, however, required to prove *reputational damages.* As the Iowa Supreme Court explained in *Schlegel,*

> Given our case recognition that defamation is based upon damage to reputation, we agree with those courts that have continued to impose a reputational harm prerequisite in defamation actions. We agree with the comments in *Little Rock, Newspapers, Inc. [v. Dodrill,* 281 Ark. 25, 660 S.W.2d 933 (Ark.1983),] that to do otherwise would set the law of defamation on end. The presumption limitation in *Gertz* was imposed to prevent the giving of "gratuitous awards of money damages far in excess of any actual injury." *Gertz,* 418 U.S. at 349, 94 S.Ct. at 3011–12, 41 L.Ed.2d at 811. As *Little Rock, Newspapers, Inc.* wisely points out, to allow defamation damages without a showing of reputational harm would undercut the Supreme Court's purpose behind the presumption limitation.
>
> Our recognition here that reputational harm is a prerequisite for parasitic damages such as mental anguish should not be surprising because we essentially said the same thing in *Johnson:* "To recover in an action for defamation, a plaintiff must ordinarily prove some sort of cognizable injury, such as an injury to reputation. Hurt feelings alone cannot serve as the basis of a defamation action." 542 N.W.2d at 513 (citation omitted). *Johnson* involved a suit against a news media defendant and was decid-

ed upon principles enunciated in *Gertz* and long after *Time, Inc.* What we have done here is simply to flesh out the reasons for this holding in *Johnson.*

In *Jones v. Palmer Communications, Inc.,* we acknowledged that "*Gertz* articulated an expansive definition of actual damages." 440 N.W.2d 884, 900 n. 5 (1989) (citation omitted). We also said we were "persuaded. to accept *Gertz* as the appropriate definition of actual damages in a defamation action." *Id.* We disavow these statements to the extent they imply that a plaintiff need not prove reputational harm to recover "parasitic" damages such as emotional distress and humiliation.

*Schlegel,* 585 N.W.2d at 223–24. Moreover, in *Wilson v. IBP, Inc.,* 558 N.W.2d 132 (Iowa 1996), *cert. denied,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997), the Iowa Supreme Court also explained the difference between requiring proof of injury to reputation, for purposes of a defamation *per se* claim, and proof of reputational *damages:*

Slander per se, however, is actionable without proof of damage. *Lara,* 512 N.W.2d at 786; *Rees v. O'Malley,* 461 N.W.2d 833, 839 (Iowa 1990); *Vinson,* 360 N.W.2d at 115–16. Recovery is limited to "those damages which were a natural and probable consequence of the original slander or its repetition or republication." *Lawrence v. Grinde,* 534 N.W.2d 414, 418 (Iowa 1995) (quoting *Brown v. First Nat'l Bank,* 193 N.W.2d 547, 555 (Iowa 1972)); *see also Rees,* 461 N.W.2d at 839. There is no indication in the record that the jury awarded ordinary damages above and beyond that permitted by this standard.

Wilson's testimony sufficiently met the requirement that the jury "be presented with evidence upon which the consequences of the [slander] can be judged, evidence such as the nature of

the plaintiff's reputation before the [slander] was published and the extent of the publication." *Rees,* 461 N.W.2d at 839 (citing *Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 300 (Iowa Ct.App.1985)). Wilson testified that as a result of this incident, he was unable to return to work because of lack of self-esteem and distrust of his employer, and that he suffered damage to his reputation as a result of Arndt's statements. He particularly emphasized the detrimental effect the communication had on his relationship with Dr. Hamsa, who accused Wilson of lying.

... As we stated in *Rees,* "[r]equiring evidence of reputation and extent of publication is necessary so that a jury can determine the extent of injury, but is not imposing a burden on the plaintiff of proving damages." *Id.* Thus, evidence of Wilson's prior reputation is only useful in determining the amount of damages awarded, not whether they should be awarded at all as a matter of law.

*Wilson,* 558 N.W.2d at 140.

In short, I have recast the instruction to provide for the award of either "general damages" or "actual damages" (consisting of "reputational damages" and "compensatory damages") for "slander *per se,*" but only "actual damages" for "slander, but not slander *per se.*" I have also added to the definition of "general damages" an explanation that it encompasses both damages to reputation and compensatory damages, relying on *Schlegel* and *Wilson,* and that proof of *injury to reputation* is required, but not proof of reputational *damages,* using language drawn from *Wilson.*

I have defined "actual damages" as including "damages to reputation" and "compensatory damages." To prove actual damages to reputation, I have added that "the plaintiff must prove both that such damages should be awarded and the amount of the damages to be

awarded," contrasting the requirement for "general damages" that the plaintiff must only prove injury to reputation to determine the amount of damages. *Cf. Wilson,* 558 N.W.2d at 140. Although *Schlegel* and *Wilson* refer only to "mental" suffering, I have referred to "mental and physical pain and suffering," as there may be physical symptoms of mental anguish, *see Lara,* 512 N.W.2d at 786 (referring to "emotional distress and resulting physical harm"), and I have explained further that "mental and physical pain and suffering" includes "mental anguish, emotional distress, humiliation, and loss of enjoyment of life," as these are the sorts of "parasitic" damages referred to in *Schlegel,* 585 N.W.2d at 224, adding "physical symptoms related to them." Although the defendants object to "future" mental and physical pain and suffering, it is unclear to me whether this is an assertion that such damages are not available as a matter of law, or simply that the defendants believe there will be no evidence of future mental and physical pain and suffering.

- I am pleased to find that the parties have no objections to **Final Jury Instruction No. 10—Punitive Damages,** as formulated in the 11/8/00 VERSION. Therefore, I have left well enough alone.

 - This brings us at last to the **VERDICT FORM.** As a general matter, I have moved the "flow" or "signal" instructions in italics into separate boxes *following* the determinations to which they relate. This should assist the jury in answering the pertinent interrogatory, then determining what their answer requires them to do. I have also revised the damages portion of the verdict form to reflect the conclusions indicated above regarding "general" and "actual" damages.

You will, of course, have the opportunity to make objections to these instructions before they are read to the jury. However, I believe that the Preliminary Jury Instructions are now in "final" form. The Final Jury Instructions and the Verdict Form, in contrast, may require some further revision, in light of evidence that develops at trial, or requests for additional or different instructions. I am faxing you these instructions now to assist you with your preparations for trial.

Thank you for your attention to these matters.